**HYCEL, INC., et al, Appellants,**

v.

**Kenneth P. WITTSTRUCK, M.D., et al, Appellees.**

**No. 10–83–157–CV.**

Court of Appeals of Texas, Waco.

Feb. 21, 1985.

Opinion After Filing of Remittitur Feb. 28, 1985.

Rehearing Denied April 18, 1985.

Charles B. McGregor, McGregor & White, David B. Kultgen, Beard & Kultgen, Waco, for appellants.

Stephen E. Harrison, II, David E. Cherry, Aubrey R. Williams, Pakis, Cherry, Beard & Giotes, Inc., Waco, for appellees.

## OPINION

THOMAS, Justice.

This is a Deceptive Trade Practices Act (DTPA) case.[1] Dr. Wittstruck, Dr. Krohn and Dr. Walter, three physicians who operated the Waco Clinical Pathology Laboratory (Laboratory) as a partnership, recovered a joint and several judgment in excess of $4.7 million against Hycel, Inc. (Hycel) and Boehringer Mannheim Diagnostics, Inc. (BMD). (Judgment was entered against BMD as Hycel's corporate successor.) The jury found that Hycel had violated several provisions of the DTPA when it sold an automated blood chemistry analyzer to the Laboratory in 1976, and that the Laboratory had suffered over $1.8 million in lost profits from 1978 through 1984 as a result of Hycel's violations. On its own motion the court disregarded the jury's finding of lost profits for 1984. Hycel and BMD, Appellants, appeal on twenty-two points of error, while the doctors, Appellees, complain in a cross-point that the court erred when it disregarded on its own motion the jury's finding of lost profits for 1984. We sustain the cross-point, reform the judgment, and conditionally affirm the reformed judgment on suggestion of a remittitur.

## FACTUAL BACKGROUND

To understand this litigation, one must understand the nature and background of the businesses involved. At the time of the transaction upon which this suit is based, Hycel was in the business of manufacturing and selling automated blood chemistry analyzers and chemicals used in their operation. Hycel sold these analyzers to businesses such as the Laboratory. The Laboratory, at the time of the transaction, was furnishing a broad range of services to physicians and hospitals in Central Texas, which included performing blood chemistries.

Blood chemistries are chemical tests performed on samples of blood serum at a physician's request. Physicians often request that a laboratory perform blood chemistries in a profile. A profile is a group of blood chemistries which assess the function of a particular organ or system, such as the heart, liver or renal system, or the general health of a person. The results of the profile are used by the requesting physician for the purposes of diagnosis and treatment. At one time blood chemistries had to be performed manually; however, improvements in technology have enabled many blood chemistries to be performed on automated blood chemistry analyzers.

In 1968 the Laboratory purchased a Technicon 12/60 automated blood chemistry analyzer which could perform twelve different chemical tests on a blood sample at the rate of sixty samples an hour. This machine was known in the trade as a "continuous flow analyzer" because all twelve tests had to be performed on each blood sample, even though the physician may have ordered fewer than twelve tests.

To avoid performing all of these tests, Hycel began developing a "selective analyzer" which would perform only the tests selected by the operator. By 1975 Hycel had developed the "Super 17" and was selling it for $98,500. Based on the operator's instructions, the Super 17 could selectively perform any number of seventeen different chemical tests on a blood sample at the rate of 120 samples an hour.

In 1975 Hycel also began research and development of the "M", a selective analyzer designed to perform more tests than the Super 17, and began distributing promotional brochures on the M. Potential customers were told that the M's initial price would be $125,000 but that the price would increase at a later date. Hycel, however, gave prospective customers two

---

1. This suit arose under the 1976 provisions of the DTPA, and all references to the DTPA in this opinion are to the provisions in effect at that time. *See Woods v. Littleton,* 554 S.W.2d 662, 666 (Tex.1977); Tex.Bus. & Com.Code Ann. § 17.41 et seq. (1973).

means of guaranteeing that the M could be purchased for $125,000: (1) a customer could pay a 10% deposit ($12,500) which would be deducted from the M's $125,000 purchase price when it was delivered; or (2) a customer could purchase a Super 17 for $98,500 and then trade the Super 17 in on the M's $125,000 purchase price at the time of delivery. Under the second option, the trade-in value of the Super 17 would be determined by depreciating it at the rate of 1½% per month.

In the latter part of 1975, the Laboratory decided to replace the Technicon 12/60 with another machine, and Dr. Walter was assigned the responsibility of recommending which analyzer should be purchased as a replacement. Walter testified that he became interested in the M when he obtained a brochure on the M in January or February of 1976. He contended the brochure represented that the M would be capable of selectively performing up to thirty chemical tests on a blood sample at the rate of 120 samples an hour. (The parties referred to this brochure during trial as the "missing brochure" because the doctors claimed that it had been lost. Hycel and BMD denied that a brochure containing this representation ever existed.) After Walter contacted Hycel to inquire about the M, Jay Armstrong, one of Hycel's salesmen, met with him in Waco on February 6. According to Walter, he and Armstrong reviewed and discussed the M brochure, the M's expected delivery date, and a brochure on the Super 17. Walter stated that Armstrong told him the M could be delivered in the fall of 1977.

Walter also testified that, after brushing aside Armstrong's efforts to sell a Super 17, he made the following four-point proposal to Armstrong: (1) the Laboratory would purchase the M and pay Hycel $125,000 when the purchase order was approved; (2) Hycel would furnish a Super 17 for the Laboratory's use until the M was delivered (the interim use of the Super 17 was to be without cost to the Laboratory, either for rental or maintenance charges);

(3) Hycel would, without cost to the Laboratory, replace three chemical tests then on the Super 17 with three chemical tests which the Laboratory preferred; and (4) Hycel would accept the Technicon 12/60 as a trade-in.

Because Walter considered the M's delivery date to be important, he tried to include a definite delivery date as the fifth point in his proposal. He admitted, however, that Armstrong refused to agree to a definite delivery date or to write any delivery date into any contract. Furthermore, Walter did not press Armstrong to agree to a delivery date because he was concerned that Hycel might refuse to approve his proposal. Walter insisted, nevertheless, that Armstrong knew the Laboratory wanted an agreement with Hycel on the M's delivery date. Walter understood that Armstrong would have to obtain approval of this proposal, and once approved, that Hycel would have the agreement embodied in a written contract to be signed by the parties.

Armstrong returned to Waco on February 9 where he met again with Walter at Providence Hospital. Walter understood that Armstrong had obtained Hycel's approval of the four-point proposal. Walter and Armstrong later drove to the Laboratory where the doctors met privately to discuss the options available to them and Walter's final recommendation. After their meeting, Walter told Armstrong that the Laboratory had decided to pay Hycel $125,000, and he returned to Providence Hospital while Armstrong, Dr. Krohn and Dr. Wittstruck completed the necessary paper work. On February 9, Krohn signed a standard Hycel purchase order on behalf of the Laboratory which described the equipment purchased as follows:

| Quantity | Description of Equipment | Price |
|---|---|---|
| 1 ea. | Super Seventeen Chemistry Analyzer with upgrade to Hycel "M" with earliest possible delivery date. Hycel M upgrade is to be without additional charge. | $125,000 |

On February 20, Armstrong wrote Walter a letter which contained the following:

> As we discussed, with a purchase order for the Hycel 'M' Hycel will install a new Super 17 Chemistry Analyzer for use in your lab until the Hycel 'M' is delivered. Delivery of the Hycel 'M' is scheduled for the latter part of 1977. There will be no additional charge for the instrument exchange at that time.

Hycel admitted that Armstrong was authorized to correspond with Walter about the matters mentioned in the letter. The Laboratory construed Armstrong's letter as a confirmation that it had purchased an M and as a commitment that Hycel would deliver the M to the Laboratory in the fall of 1977. Hycel approved the purchase order on May 9, which was the same day that the Super 17 was installed in the Laboratory. Krohn mailed Hycel a check on May 14 for $131,250 ($125,000 plus $6,250 sales tax).

On October 5, 1978, the doctors wrote a letter to Hycel demanding a return of $131,250 plus interest because Hycel had failed to deliver an M to the Laboratory in the fall of 1977. On October 13 Hycel responded to the Laboratory's demand through a letter by its corporate counsel, notifying the Laboratory that it had not purchased an M but had purchased a Super 17. Hycel, however, later offered to return the purchase money but only after rental charges would be deducted for the Super 17 back to May 9, 1976, the date the Super 17 had been installed in the Laboratory. The doctors refused Hycel's offer and filed suit in April 1979. Hycel thereafter tendered an M to the Laboratory on three occasions (once in 1980 and twice in 1981), but the Laboratory refused the tenders. (The jury found that the M was not merchantable on those occasions.) The Laboratory purchased an ACA analyzer in September 1980 and a Vickers analyzer in January 1981. According to the doctors, these two analyzers were purchased to perform blood chemistries which the M would have performed if it had been delivered when promised and as represented. The Laboratory discontinued its use of the Super 17 in 1981. This suit was tried during January and February of 1983.

At trial, the Laboratory contended that it had purchased an M for $125,000 which was to be delivered in the fall of 1977. The Laboratory further claimed that Hycel had misrepresented the M's characteristics, uses or benefits and had breached an express warranty of delivery date. Hycel and BMD contended, however, that Hycel had performed all of its obligations under the purchase order because the Laboratory had not purchased an M but had purchased a Super 17 for $125,000, with a right to upgrade the Super 17 to an M at no additional cost. Hycel and BMD denied that the M had ever been represented as being capable of performing thirty tests, and they blamed the delay in the M's production and delivery on the protracted process necessary to obtain marketing approval of the M from the U.S. Food and Drug Administration.

The jury found, among other things, that Hycel had misrepresented the M's characteristics, uses or benefits and had expressly warranted that an M would be delivered to the Laboratory in the fall of 1977. The jury also found that Hycel was guilty of unconscionable acts as well as false, misleading or deceptive acts or practices. All of these misrepresentations, acts or practices were found to be producing causes of the following lost profits: (1978) $98,517; (1979) $161,831; (1980) $212,019; (1981) $222,053; (1982) $295,390; (1983) $376,715; and (1984) $472,463. The jury further found that the Laboratory had incurred $165,900 (the total purchase price of the Vickers and ACA analyzers) in reasonable and necessary expenses as a result of Hycel's conduct and $161,500 in reasonable attorneys' fees. The jury failed to find that Hycel had represented the M would be capable of performing 30 tests on 120 samples an hour or that Hycel had advertised

the M with the intent not to sell it as advertised.

■ The court did not submit an issue requesting the jury to decide whether the Laboratory had purchased an M or a Super 17 under the purchase order and Hycel and BMD did not object to this omission. The evidence was factually sufficient to support either contention. Because this issue was an element of the Laboratory's causes of action, the issue must be deemed found in support of the judgment. *See* Tex.R.Civ.P. 279.

On its own motion the court disregarded the jury's finding of lost profits incurred in 1984 because the court determined that the finding exceeded the evidence of lost profits for that year. The court calculated the Laboratory's actual damages by adding the lost profits incurred between 1978 and 1983 to the Laboratory's expense of purchasing the Vickers and ACA analyzers. The court then trebled the Laboratory's actual damages under section 17.50(b) of the DTPA and entered judgment for that amount. The judgment also included prejudgment interest on the Laboratory's expenditures for the Vickers and ACA analyzers and reasonable attorneys' fees. The judgment totaled $4,778,535.25.

## LIABILITY UNDER THE DTPA

■ In their twentieth point of error, Hycel and BMD claim that the court erred when it awarded damages to the Laboratory because none of the jury's findings on the liability issues support the jury's findings on damages. Prior to the 1979 amendment to section 17.50(a), a consumer could recover under the DTPA if he could establish that he had been "adversely affected" by any act or practice declared to be deceptive. Tex.Bus. & Com.Code Ann. § 17.50(a) (1973). "Adversely affected" was interpreted to mean "producing cause." *See Rotello v. Ring Around Products, Inc.*, 614 S.W.2d 455, 461 (Tex. Civ.App.—Houston [14th Dist.] 1981, writ

ref'd n.r.e.). Thus, a single violation of section 17.46(b) can support a damage award if the evidence supports findings that the violation occurred and that it was a producing cause of the damages. *See Spradling v. Williams*, 566 S.W.2d 561 (Tex.1978). The jury found that Hycel had violated several subsections of section 17.-46(b) and that these violations were producing causes of the Laboratory's damages. We therefore begin our analysis by determining whether one of these violations is supported by the evidence so as to support the damage award.

■ The jury found in response to the first special issue that Hycel had misrepresented the M's characteristics, uses or benefits. If supported by the evidence, this finding would establish a "laundry-list" violation of section 17.46(b)(5) of the DTPA. Hycel and BMD contend in point fifteen that this finding fatally conflicts with the jury's "no" answer to issue twelve, which asked if Hycel had represented that the M could perform 30 tests on 120 samples an hour. The "no" answer to issue twelve represents a failure of proof on the Laboratory's part, not a contrary finding on the issue posed, and thus no conflict exists. *See C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966). Point fifteen is overruled.

Because the jury failed to find that Hycel had represented the M would perform thirty tests, Hycel and BMD contend the evidence is legally and factually insufficient to support a finding that Hycel had misrepresented the M's characteristics, uses or benefits. This argument must be rejected.

■ When reviewing no evidence points, the appellate court must consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, while giving effect to all reasonable inferences that may properly be drawn therefrom and disregarding all contrary or conflicting evidence. *Glover v. Texas General Indemnity Co.*, 619 S.W.2d

400 (Tex.1981). If the court finds that there is a complete absence of evidence of *probative force* to support the finding, or that only a scintilla of evidence supports the finding or that the evidence tending to support the finding must be disregarded because it is incompetent or otherwise legally insufficient, then the point must be sustained. Cornelius, *Appellate Review of Sufficiency of the Evidence Challenges in Civil and Criminal Cases,* 46 Tex.B.J. 439, 440 (April 1983). When an appellate court considers factual insufficiency points, however, it must consider all of the evidence to determine if the evidence is factually sufficient to support the finding. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). After reviewing the evidence under these standards we conclude that the evidence is legally and factually sufficient to support the jury's finding that Hycel had misrepresented the M's characteristics, uses or benefits apart from any alleged misrepresentation about its capability of performing thirty tests.

Although Hycel's 1975–1976 brochures contained a list of chemical tests purportedly available on the M, Hycel knew that the M could not perform several of the tests because of its design limitations. The jury could have reasonably concluded that Hycel had misrepresented the M's capability to perform those tests to induce purchases of the M. Hycel's own witness, Dr. Kraft, admitted that such sales tactic could be misleading to potential customers.

■ Hycel and BMD argue, however, that the Laboratory could not have been misled by any representations in its brochures because of the following disclaimer which appeared on the brochures: "All illustrations and specifications contained in this folder are based on the latest information available at the time of publication approval. Hycel reserves the right to make changes at any time without notice in materials, equipment, specifications and models, and to discontinue models." Section 17.42 of the DTPA provided: "Any

waiver by a consumer of the provisions of this subchapter is contrary to public policy and is unenforceable and void." Section 17.42, which prevented the Laboratory from waiving a violation of section 17.-46(b)(5), indicates the legislature's disapproval of efforts or ruses designed to avoid liability under the DTPA. To allow Hycel to insulate itself from a violation of section 17.46(b)(5) through such a disclaimer would only emasculate the DTPA and serve to encourage deceptive trade practices. Therefore, section 17.42 must also preclude Hycel from relieving itself of responsibility for a violation of section 17.46(b)(5) through such a disclaimer. *See NL Well Service/NL Industries, Inc. v. Flake Industrial Services, Inc.,* 656 S.W.2d 584 (Tex.App.—Fort Worth 1983, writ ref'd n.r. e.). The disclaimer relied on by Hycel and BMD is ineffective in this suit.

In response to the second special issue, the jury found that Hycel's misrepresentation of the M's characteristics, uses or benefits was a producing cause of the Laboratory's damages. Producing cause was defined in the charge as "an efficient, exciting or contributing cause which in a natural sequence produced a part or all of any damages complained of, if any." In points five and six, Hycel and BMD attack the legal and factual sufficiency of the evidence supporting this finding. They also argue that any misrepresentation of the M's characteristics, uses or benefits could not be a producing cause of the Laboratory's lost profits as a matter of law. This argument is also without merit.

■ "Producing cause" under the DTPA does not encompass the element of foreseeability as does proximate cause; therefore, a consumer need only prove the amount of actual damages factually caused by the deceptive trade practice. *Rotello,* 614 S.W.2d at 461. Thus, the question is not whether the Laboratory and Hycel reasonably foresaw that lost profits would result from Hycel's violation of section 17.46(b)(5) but whether Hycel's violation, in a natural

sequence, excited, contributed to or factually caused the Laboratory's lost profits. *See Pope v. Rollins Protective Services Co.*, 703 F.2d 197, 202 (5th Cir.1983).

Although foreseeability was not a prerequisite, Hycel knew that the Laboratory was in the business of performing blood chemistries for profit and that the Laboratory was purchasing an analyzer to further that business purpose. The doctors testified that they would not have purchased an M or obligated their funds for its purchase if they had known that Hycel was misrepresenting its characteristics, uses or benefits. Reviewing the evidence under the appropriate standards, we conclude that the evidence is legally and factually sufficient to support a finding that Hycel's misrepresentation of the M's characteristics, uses or benefits was a producing cause of the Laboratory's lost profits. *See id.* at 203; *White v. Southwestern Bell Telephone Co., Inc.*, 651 S.W.2d 260 (Tex. 1983). A manufacturer who misrepresents the characteristics, uses or benefits of a machine which is to be used by a consumer to generate profits in business must stand liable under the DTPA for the loss of additional profits that would have been earned had the machine been delivered as represented. Points five and six are overruled.

Hycel's liability thus rests on a violation of Section 17.46(b)(5) which was found to be a producing cause of the Laboratory's damages. Point twenty, in which Hycel and BMD assert that the findings on liability issues do not support the damages issues, is overruled. We do not reach those points of error which challenge other liability issues.

## DAMAGES

We now turn to a discussion of those points which attack the damage issues. Hycel and BMD contend in points one and two that the Laboratory could not recover lost profits because of the following provision in the purchase order:

1. Warranty/Remedy ... BUYER'S SOLE AND EXCLUSIVE REMEDY AGAINST SELLER RESPECTING THE EQUIPMENT AND ITS USE SHALL BE THE REPAIR OR REPLACEMENT OF DEFECTIVE WARRANTED PARTS OR COMPONENTS AS DESCRIBED HEREINABOVE IN THIS PARAGRAPH, *AND NO OTHER REMEDY (INCLUDING BUT NOT LIMITED TO INCIDENTAL OR CONSEQUENTIAL DAMAGES) SHALL BE AVAILABLE TO BUYER.* (emphasis added).

The Laboratory contends that this provision is unenforceable because it violated section 17.42, which prevented a waiver of the DTPA by a consumer. While the provision might be effective to preclude recovery of consequential damages, such as lost profits, in a suit based on breach of contract, the provision cannot be given effect in a suit under the DTPA. *See NL Well Service/NL Industries, Inc.*, 656 S.W.2d at 584. To hold otherwise would allow the Laboratory, as a consumer, to contractually waive or limit its recovery of damages under the DTPA, thus circumventing the clear intent of section 17.42. Points one and two are overruled.

The purchase order also contained a liquidated damages clause which Hycel and BMD insist precluded the recovery of lost profits and limited the Laboratory's remedy to a recovery of $131,250, the amount paid to Hycel under the purchase order. This provision stated:

9. Liquidated Damages ... If Buyer rightfully rejects or revokes acceptance of an item of Equipment, Seller shall have opportunity within one month from receipt of notice of such rejection or revocation to substitute a conforming tender. If Seller shall not avail itself of that opportunity, Buyer as liquidated damages shall have the *exclusive remedy of refund to him of the amount of the deposit specified on the front face hereof* offset to the extent of transportation and handling expenses incurred by

Seller in delivery and installation of the Equipment to and for Buyer. (emphasis added).

For the reasons already given, this provision also violates section 17.42 and, therefore, cannot be given effect in a suit under the DTPA. *See Watson v. Bettinger*, 658 S.W.2d 756 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.); *NL Well Service/NL Industries, Inc.*, 656 S.W.2d at 584. Point four is also overruled.

■ In point nineteen Hycel and BMD complain that the court erred when it submitted the damage issue relating to lost profits because the issue did not expressly limit the jury to finding lost profits which were produced by Hycel's acts. Issue fifty-three asked the jury to find the amount of lost profits which "resulted from the actions of Hycel and BMD, if any, inquired about in [other] special issues...." All of the special issues listed in issue fifty-three were referrable to Hycel's acts, and thus the jury was expressly limited to finding lost profits that were produced by or resulted from Hycel's acts. Point nineteen is overruled to the extent it asserts that issue fifty-three was improperly submitted.

As noted before, the Laboratory purchased a Vickers analyzer in December 1980 for $126,000 and an ACA analyzer for $39,900 in January 1981. In response to issues fifty-four and fifty-five, the jury found that the amounts paid for the Vickers and ACA analyzers were reasonable and necessary expenses which the Laboratory had incurred as a result of Hycel's conduct. The court included the trebled costs of both machines in the judgment.

In points twenty-one and twenty-two, Hycel and BMD assert that the evidence is legally and factually insufficient to show that the costs of purchasing the Vickers and ACA analyzers are recoverable. Hycel and BMD apparently contend that the Laboratory was not entitled to recover the reasonable and necessary expenses of mitigating its damages as a matter of law. Also, Hycel and BMD apparently argue

that the evidence conclusively demonstrated that the Laboratory waited an unreasonable length of time before attempting to mitigate.

■ The Laboratory had a duty to mitigate the loss of profits resulting from Hycel's actionable conduct. *See Meadolake Foods, Inc. v. Estes*, 218 S.W.2d 862 (Tex.Civ.App.—El Paso 1948), writ ref'd n.r.e. per curiam, 219 S.W.2d 441 (Tex. 1949). According to the doctors, the Vickers and ACA analyzers were purchased for this purpose, and the jury found that the prices paid for the analyzers were reasonable and necessary expenses incurred as a result of Hycel's conduct. Reasonable and necessary expenses of mitigating an economic loss are, therefore, recoverable under the DTPA as actual damages. *See Texas & P.R. Co. v. Mercer*, 127 Tex. 220, 90 S.W.2d 557 (1936).

■ The evidence is by no means conclusive on whether the Laboratory waited an unreasonable length of time to mitigate. It waited over three years, from the fall of 1977 to December 1980, before purchasing the Vickers and ACA analyzers. The doctors claimed, however, that when Hycel failed to deliver the M in the fall of 1977, they continued to rely on Hycel's repeated promises to deliver the M "very soon" or in another sixty or ninety days. The evidence presented a fact question on the Laboratory's diligence, but no issue was submitted to the jury. Hycel and BMD's complaint about the Laboratory's lack of diligence in mitigating its damages has been waived. *See Martin v. McKee Realtors, Inc.*, 663 S.W.2d 446 (Tex.1984); Tex.R. Civ.P. 279. Points twenty-one and twenty-two are overruled.

One of the principal areas of disagreement between the parties is whether the evidence is legally and factually sufficient to support the jury's findings of lost profits in issue fifty-three. Viewing the evidence under the appropriate standards, we conclude, as explained later in the opinion, the

judgment is excessive because the jury's calculation of lost profits is manifestly excessive. Point nineteen is, therefore, sustained insofar as it attacks the legal sufficiency of the evidence supporting the jury's calculation of lost profits. Having found no other error in the record requiring a reversal, other than an error in the judgment resulting from excessive lost profits awarded as damages, the judgment as later reformed will be conditionally affirmed on suggestion of remittitur. *See State v. Nesom,* 395 S.W.2d 424 (Tex.Civ.App.—Beaumont 1965, writ ref'd n.r.e.).

To understand why the jury's verdict is excessive, the evidence supporting the jury's calculation of lost profits must be dissected. Dr. Kenneth Gilbreath, an economist, testified as an expert witness and calculated the Laboratory's lost profits from 1978 through 1984. Gilbreath partially based his calculations on certain assumptions supplied by Walter and on data supplied to him by Gary Bonds, a CPA. The principal assumptions were that: (1) a merchantable M would have been available for use in the Laboratory by January 1, 1978; (2) the M would have been capable of performing 30 tests on 120 samples an hour; (3) the number of profiles performed on the M would have increased at the rate of 10.6% per year; (4) the Laboratory would have experienced a one-time, 15% increase in the number of profiles when the M was placed in service; and (5) one-half of all profiles performed on the M from 1978 through 1984 would have been 30-test profiles and one-half would have been 25-test profiles. Bonds and Gilbreath also used other assumptions involving the Laboratory's general overhead and its effect on the analyzers' operating costs and relating to sales prices and costs of 25 and 30-test profiles.

Based on Walter's assumptions, Bonds calculated and supplied Gilbreath with the number of profiles performed by the Laboratory from 1972 through 1978, the average sales prices and average costs of pro-

files, and the profits that the Laboratory had earned from its machine-performed profiles from 1978 through 1981. Bonds assembled a portion of the profile data for 1972 through 1978 by hand-counting over 45,000 of the Laboratory's records, while the remainder of the data was extrapolated from the Laboratory's tissue and pap logs and computer printouts. To determine the cost of 25 and 30-test profiles for 1978, Bonds first calculated the average cost per test of a 20-test profile. He then multiplied the average cost per test of a 20-test profile in 1978 by twenty-five and thirty to arrive at the average cost of a 25 and 30-test profile. Bonds projected the costs of 25 and 30-test profiles for 1979 through 1984 by increasing the cost of each profile by an annual inflation rate of 8.47% which Gilbreath had calculated based on data from the U.S. Bureau of Labor Statistics. Bonds also calculated the average sales prices of 25 and 30-test profiles in a similar manner, starting with the average sales price per test of a 20-test profile in 1978; however, Bonds projected the average sales prices for 25 and 30-test profiles for 1978 through 1981 by using the annual percentage increase in the average sales price of 20-test profiles from year-to-year. To calculate the Laboratory's actual profits from machine-performed profiles for 1978 through 1981, Bonds deducted annual profile expenses from annual profile revenues in each year.

Beginning with the number of profiles actually performed by the Laboratory in 1978, Gilbreath projected the number of profiles which would have been performed on the M through 1984. His projections were based on an average annual growth rate of 10.6%, which he calculated from the profiles actually performed by the Laboratory from 1972 through 1977. His projections also included a one-time, 15% increase in profiles during 1979 to reflect an increase in profile business from placing the M in service. Gilbreath then projected average sales prices of 25 and 30-test profiles for 1982 through 1984 and calculated

the Laboratory's expected profits from its machine-performed profiles for 1982 through 1984 by using the same methodology employed by Bonds.

Simply stated, Dr. Gilbreath determined the Laboratory's annual lost profits for 1978 through 1984 by: (1) calculating what the M's profit would have been in each year for 25 and 30-test profiles (i.e. the difference between the M's estimated annual revenues and operating expenses); (2) then subtracting the Laboratory's actual or expected profits (earned from the Super 17 or the Vickers and ACA) during the same year from the M's profits; and (3) compounding lost profits from 1978 through 1981 and discounting lost profits for 1983 and 1984 to arrive at the value of all lost profits if paid in cash in 1982. Gilbreath's calculations of the M's profits from 25 and 30-test profiles are illustrated by Chart 1 and Chart 2 which are attached to this opinion. Chart 3, which explains Gilbreath's calculations of the Laboratory's annual lost profits, is also attached.

The jury generally used Bonds' and Gilbreath's methodology to calculate lost profits from 1978 through 1984. Chart 4, which shows the jury's calculations, agrees precisely with the jury's findings on issue fifty-three. Several conclusions are evident from an examination of Chart 4. First, the jury based its calculation of lost profits on the premise that all profiles performed on the M would have been 25-test profiles. The jury thus rejected the Laboratory's assumption that one-half of the profiles would have been 30-test profiles. Second, in calculating lost profits the jury deducted the Laboratory's actual and expected profits by using the Super 17 or the Vickers and ACA from the M's profits. Third, the jury did not discount lost profits for 1983 and 1984. Clearly, the jury accepted the calculations and projections of the number of profiles, the Laboratory's actual and expected profits from using the Super 17 or the Vickers and ACA, and the average sales price and average cost of

25-test profiles. The jury, therefore, accepted all of the data supporting those calculations and projections.

Hycel and BMD claim that the trial court erred in entering judgment on the jury's findings because they question the methodology that Bonds and Gilbreath used to assemble the underlying data. They also attack many of the assumptions supporting the calculation of lost profits. Hycel and BMD question, in particular, the accuracy and reliability of Gilbreath's calculations because they were allegedly based on an assumption that the M could have performed 30-test profiles. They also question whether the evidence was legally sufficient for the jury to "adjust" its calculations of lost profits from a 30-test machine to a machine which performed fewer than thirty tests.

■■■ To recover its lost profits, the Laboratory had the burden of producing sufficient evidence from which the jury could determine the net amount of lost profits with reasonable certainty. *See White v. Southwestern Bell Telephone Co., Inc.*, 651 S.W.2d 260 (Tex.1983). To meet this burden, the Laboratory could compare the amount of business that it had done in a corresponding period of time not too remote with the amount of business done or expected to be done during the period for which recovery was sought. *See Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097 (Tex.1938). The Laboratory could also prove lost profits by showing other relevant factors, including past and projected revenues, expenses and profits, and the normal increase in business that could be expected with reasonable certainty in the future. *See id.; Richker v. Georgandis*, 323 S.W.2d 90 (Tex.Civ.App.— Houston 1959, writ ref'd n.r.e.). While data from which the jury determines lost profits cannot rest on mere conjecture, it need not show lost profits with mathematical exactness. *See White*, 651 S.W.2d at 260.

■■■ Dr. Moore, a statistician, reviewed the methodology which Bonds and Gil-

breath used to assemble the underlying data and to calculate lost profits. Moore generally testified that their methodology was sound and that their calculations were based on reasonable statistical probability. Considering the record as a whole, Bonds' and Gilbreath's methodology must be considered valid; thus, the evidence was legally and factually sufficient to support the data upon which their calculations were based. The assumption that the Laboratory would have experienced a one-time 15% increase in its profile business if the M had been placed in service is reasonable, especially in light of Hycel's own witness who testified that a laboratory could reasonably expect a 30% increase in profiles once the M is installed. Other assumptions which Bonds and Gilbreath used to assemble underlying data and to calculate lost profits are also legally and factually supported by the evidence, with one exception. The one exception is Walter's assumption that one-half of all of the profiles performed on the M from 1978 through 1984 would have been 30-test profiles and one-half would have been 25-test profiles. The evidence is legally insufficient to support this assumption.

The Laboratory placed other evidence in the record which conclusively demonstrated that Walter's opinion about the number of tests which physicians would have requested in a profile lacked probative value. Chart 5, which is attached to this opinion, reflects the number of profiles that the Laboratory actually performed (including the number of tests within profiles) from 1978 through 1981. Chart 5 illustrates that 20-test profiles never exceeded 33.6% of the Laboratory's annual profiles or 46.3% of its annual revenues from machine-performed profiles from 1978 through 1981. In fact, 20-test profiles began a steady decline in 1978 as percentages of annual profiles and annual profile revenue. Yet, in the face of this actual experience, Walter asked Gilbreath and the jury to calculate lost profits based on the premise that one-half of the M's profiles would have been 30-test pro-

files and one-half 25-test profiles. Even in 1981, when the Vickers was available to perform 20-test profiles, only 24.4% of the Laboratory's total profiles consisted of twenty tests, and these 20-test profiles accounted for only 33.8% of profile revenues.

██ The jury based its calculation of lost profits on the premise that 100% of the M's profiles would have contained twenty-five tests. The only evidence remotely supporting this premise is Walter's testimony that one-half of the M's profiles would have contained twenty-five tests and one-half would have contained thirty tests. Walter's opinion testimony is not supported by probative evidence, as shown by Chart 5, and thus the opinion lacks probative value. *See Berne v. Keith,* 361 S.W.2d 592, 603 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.). The jury's premise that 100% of the profiles performed on the M would have contained twenty-five tests is thus not supported by probative evidence. After allowing for growth in the number of tests within profiles from twenty to twenty-five, as well as reasonable growth in the percentages of 25-test profiles to the annual number of profiles and annual profile revenue, the jury's calculation of lost profits is excessive by 50%.

██ Hycel and BMD objected to the court's instruction on lost profits because it did not instruct the jury to calculate lost profits by deducting the Laboratory's actual or expected profits from using the Super 17 or the Vickers and ACA analyzers from the M's profits; however, the court overruled their objection. In their seventh point Hycel and BMD argue that one cannot determine whether the jury deducted actual or expected profits from the M's profits, and that the court committed reversible error when it overruled their objection. The Laboratory contends that the point has been waived because the objection was not sufficient to preserve the error for review. Assuming, without deciding, that the error has been preserved for

appellate review, the seventh point must nevertheless be overruled. Chart 4, which reflects the jury's calculation of lost profits, reveals that the jury did calculate the Laboratory's lost profits by deducting actual and expected profits from the M's profits. Any error in this instruction or arising from the court's overruling of Hycel's and BMD's objection was thus harmless. Point seven is overruled.

■■■■ The Laboratory complains by cross-point that the court erred when, on its own motion, it disregarded the jury's finding of $472,463 in lost profits for 1984. Hycel and BMD contend that the cross-point has been waived. A judge may disregard a jury finding only upon a motion when the finding has no support in the evidence. *Ballard v. Hillcrest State Bank of University Park*, 592 S.W.2d 373 (Tex. Civ.App.—Dallas 1979, writ ref'd n.r.e.). As noted above, the evidence is sufficient to support a finding of lost profits for 1984; therefore, the court could not disregard the jury's finding. The cross-point is sustained and the judgment is reformed by adding $472,463 lost profits for 1984 to the Laboratory's actual damages prior to the calculation of the suggested remittitur. *See Smith v. Baldwin*, 611 S.W.2d 611 (Tex. 1980).

■■■ As previously noted, Chart 4 reveals that the jury did not discount lost profits for 1983 or 1984. Using February 1983 yields on U.S. Treasury Securities as discount rates, Gilbreath discounted lost profits for 1983 by 1.0918% and for 1984 by 1.0975% to arrive at their 1982 values. The jury should have discounted lost profits for both years. *See Look v. Werlin*, 590 S.W.2d 526 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ); *Lee v. Lee*, 509 S.W.2d 922, 927 (Tex.Civ.App.—Beaumont 1974, writ ref'd n.r.e.). Legally and factually sufficient evidence supports Gilbreath's discount rates. Therefore, after the judgment is reformed to include 1984 lost profits as a part of actual damages and

lost profits for 1978 through 1984 have been reduced by 50% to remove the excess, lost profits for 1983 and 1984 will be discounted by the rates suggested by Gilbreath. *See Kansas City Southern Railway Co. v. Lawson*, 435 S.W.2d 582 (Tex. Civ.App.—Beaumont 1968, no writ).

■■■ Having found no other error in the record which would require a reversal, other than an error in the judgment resulting from excessive damages, we conditionally affirm the judgment as reformed on a suggested remittitur of $1,508,928. *See* Tex.R. Civ.P. 440. The amount of the suggested remittitur has been determined by: (1) totalling the jury's findings of lost profits for 1978 through 1984 ($1,838,988); (2) reducing the jury's findings of lost profits by 50% to remove the excess ($1,838,988 – $919,494 = $919,494); (3) discounting 1983 lost profits, after reduction, by 1.0918% and discounting 1984 lost profits, after reduction, by 1.0975% ((1983) $188,258 ÷ 1.0918% = $172,521; (1984) $236,232 ÷ 1.0975% = $215,246) ($215,246 ÷ 1.0975% = $196,-124); (4) adding the total lost profits thus determined to the expense of mitigation and then trebling the total under section 17.50(b) of the DTPA (($863,549 + $165,-900) × 3 = $3,088,347); and (5) subtracting the amount calculated under (4) above from $4,597,275, which the trial court found to be the trebled amount of actual damages in its judgment ($4,597,275 – $3,088,347 = $1,508,928). The remittitur, if filed, shall not affect other portions of the court's judgment, such as the award of attorneys' fees in the trial court or appellate courts or prejudgment interest on the cost of mitigation.

Therefore, unless the Laboratory shall, within 10 days from the date of this opinion, file a remittitur in the amount of $1,508,928, the entire judgment will be reversed and the cause remanded for a new trial. If the suggested remittitur is timely filed, then the judgment will be affirmed as reformed.

Chart No. 1

GILBREATH'S CALCULATIONS OF M'S ANNUAL PROFITS ON 30-TEST PROFILES
(Compiled from plaintiffs' exhibit No. 118, p. 3)

|                                | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 |
|--------------------------------|------|------|------|------|------|------|------|
| Total Revenues                 | $151086 | $209208 | $238106 | $266506 | $319680 | $383507 | $460151 |
| Total Costs                    | −49349 | −64051 | −71096 | −74740 | −79381 | −92559 | −110271 |
| Annual Profits                 | $101737 | $145157 | $167010 | $191766 | $240299 | $290948 | $349886 |
| Number of Profiles[1]          | (5960) | (7580) | (8384) | (9273) | (10256) | (11343) | (12545) |

[1] Represents only 50% of total profiles

Chart No. 2

GILBREATH'S CALCULATIONS OF M'S PROFITS ON 25-TEST PROFILES
(Compiled from plaintiffs' exhibit No. 118, p. 3)

|                                | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 |
|--------------------------------|------|------|------|------|------|------|------|
| Total Revenues                 | $125875 | $174340 | $198365 | $222088 | $266451 | $319646 | $383501 |
| Total Costs                    | −39667 | −48815 | −54328 | −56751 | −59587 | −69419 | −82546 |
| Annual Profits                 | $88208 | $125525 | $144037 | $165337 | $206864 | $250227 | $300955 |
| Number of Profiles[1]          | (5960) | (7580) | (8384) | (9273) | (10256) | (11343) | (12545) |

[1] Represents only 50% of total profiles

### Chart No. 3

#### GILBREATH'S CALCULATION OF LOST PROFITS
(Compiled from plaintiffs' exhibit No. 118, pp. 3, 4)

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|---|---|
| M's Annual Profits on 30-Test Profiles | $101737 | $145157 | $167010 | $191766 | $240299 | $290948 | $349880 |
| M's Annual Profits on 25-Test Profiles | +88208 | +125525 | +144087 | +165337 | +206864 | +250227 | +300955 |
| Total Annual Profits from M | 189945 | 270682 | 311047 | 357103 | 447163 | 541175 | 650835 |
| Annual Profits Earned from Other Analyzers | −77899 | −89219 | −76055 | −108621 | −118338 | −123739 | −129447 |
| Annual Lost Profits | $112046 | $181463 | $234992 | $248482 | $328825 | $417436 | $521388 |
| Compounded/Discounted Value[1] | $161202 | $251882 | $308403 | $284065 | (unadjusted) | $382337 | $432865 |

[1] Lost profits for 1978 were compounded by 9.52%; 1979 by 11.55%; 1980 by 14.56%, and 1981 by 14.32%; lost profits for 1983 were discounted by 1.0918%; and 1984 by 1.0975%.

### Chart No. 4

#### JURY'S CALCULATIONS OF LOST PROFITS

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 |
|---|---|---|---|---|---|---|---|
| M's Annual Profits on 25-Test Profiles[1] | $88208 | $125525 | $144087 | $165337 | $206864 | $250227 | $300955 |
| M's Annual Profits on 25-Test Profiles[1] | +88208 | +125525 | +144087 | +165337 | +206864 | +250227 | +300955 |
| Total Annual Profits from M | 176416 | 251050 | 288074 | 330674 | 413728 | 500454 | 601910 |
| Annual Profits Earned from Other Analyzers | −77899 | −89219 | −76055 | −108621 | −118338 | −123739 | −129447 |
| Annual Lost Profits[2] | $98517 | $161831 | $212019 | $222053 | $295390 | $376715 | $472463 |

[1] Represents profit on only 50% of total profiles
[2] Annual lost profits agree with jury's answers to issue No. 53

Chart No. 5

PROFILES AS PERCENTAGES OF AVERAGE MONTHLY
PROFILES AND AVERAGE MONTHLY REVENUE
(Compiled from plaintiffs' exhibits 109A, 110A)

| Year | Avg. Monthly Profiles | % of Avg. Monthly Profiles | Avg. Monthly Revenue | % of Avg. Monthly Revenue |
|---|---|---|---|---|
| 1978 | | | | |
| Profile 17 | 326 | 32.8% | $3104 | 25.5% |
| Profile 18 | 133 | 13.4 | 1436 | 11.8 |
| Profile 19 | 15 | 1.6 | 176 | 1.4 |
| Profile 20 | 334 | 33.6 | 5645 | 46.3 |
| Other Profiles[1] | 185 | 18.6 | 1834 | 15.0 |
| Totals | 993 | 100.0% | $12195 | 100.0% |
| 1979 | | | | |
| Profile 17 | 293 | 28.0% | $3161 | 21.9% |
| Profile 18 | 155 | 14.8 | 1961 | 13.6 |
| Profile 19 | 14 | 1.3 | 187 | 1.3 |
| Profile 20 | 349 | 33.4 | 6422 | 44.6 |
| Other Profiles[1] | 234 | 22.5 | 2678 | 18.6 |
| Totals | 1045 | 100.0% | $14409 | 100.0% |
| 1980 | | | | |
| Profile 17 | 298 | 30.7% | $3364 | 25.1% |
| Profile 18 | 146 | 15.0 | 1828 | 13.7 |
| Profile 19 | 21 | 2.2 | 291 | 2.2 |
| Profile 20 | 268 | 27.7 | 5073 | 38.0 |
| Other Profiles[1] | 236 | 24.4 | 2808 | 21.0 |
| Totals | 969 | 100.0% | $13364 | 100.0% |
| 1981 | | | | |
| Profile 17 | 274 | 30.4% | $3137 | 25.2% |
| Profile 18 | 98 | 11.0 | 1261 | 10.2 |
| Profile 19 | 18 | 2.0 | 254 | 2.1 |
| Profile 20 | 219 | 24.4 | 4196 | 33.8 |
| Other Profiles[1] | 290 | 32.2 | 3572 | 28.7 |
| Totals | 899 | 100.0% | $12420 | 100.0% |

[1] "Other Profiles" include Profile 17+T4, Liver profile, Certainteed profile, Chem. 18+T4, Profile 18+T4+4DL, Routine Health Profile and Routine Health Profile RPR.

## OPINION AFTER FILING OF REMITTITUR

Appellees have timely filed the remittitur suggested in our opinion. We, therefore, reform and affirm the judgment of the trial court in accordance with our opinion delivered on February 21, 1985. Costs of appeal are assessed one-third against Appellees and two-thirds against Appellants.