UNIVERSAL COMMODITIES, INC.,
et al., Appellants,

v.

Harold A. WEED, Individually, and d/b/a
Especies Del Mar, et al., Appellees.

No. 17339.

Court of Civil Appeals of Texas.

Dallas.

Dec. 12, 1969.

Rehearing Denied Jan. 9, 1970.

Jack N. Price, Price, Fisher, Hill & Patton, Longview, for appellants.

W. R. Sessions, Dallas, Bill Glaspy, Mesquite, for appellees.

DIXON, Chief Justice.

Appellants Universal Commodities, Inc., hereinafter called Universal, and Jerry E. Young and L. F. Sneed, Jr., individually, plaintiffs in the trial court, sued Harold A. Weed, individually and doing business as Especies Del Mar, Dr. Randolph Gillum and Texas Cattle Corporation, defendants in the trial court. In an amended petition appellants charge Weed with breach of contract and further charge that appellees Weed, Gillum, Texas Cattle Corporation, and one James M. Malone * conspired to

* Malone was originally made a party defendant. But appellants were unable to obtain service of citation on him. So the action as to Malone was severed from this action. Appellants say they do not know the present whereabouts of Malone.

cause and did cause Weed to breach a contract with appellants to appellants' great damage.

On May 3, 1967 appellee Weed and Universal, acting by and through Universal's President, James M. Malone, entered into a written contract whereby Weed leased to Universal a refrigeration packing plant in Guayaquil, Ecuador, to be used by Universal as a seafood processing and packing plant. It was this contract which appellant alleges was breached by Weed when by written notice dated May 23, 1967 he cancelled the contract, and thereafter, pursuant to a conspiracy with Malone and Gillum, he entered into a similar lease contract with Texas Cattle Corporation, Inc. dated June 8, 1967.

Prior to the submission of special issues to a jury Weed and Gillum filed motions for instructed verdict. The motions were overruled.

The jury returned a verdict finding that (1) before cancellation of the contract dated May 3, 1967 Universal Commodities had obtained a satisfactory marketing agreement with Inter-American Foods, Inc. with reference to seafood products; (2) Weed had not delivered any seafood products to Universal at a processing plant in Guayaquil, Ecuador; (3A) prior to May 24, 1967 Universal did not have financial resources sufficient to operate the seafood processing plant at Guayaquil; (3B) prior to May 24, 1967 Universal was not ready and willing to take over operation of said plant; (4) Universal did not, three days or more before May 23, 1967, ship any processed seafoods from the plant at Guayaquil; (6) after the contract of May 3, 1967 was signed Weed agreed to extend the time to June 20, 1967 for Universal to take over operation of the plant at Guayaquil; (7) Universal did not take over operation of the plant before May 23, 1967; (8) after May 3, 1967 and before May 23, 1967 Randolph Gillum and James Malone entered into an agreement to obtain from Weed a contract concerning operation of the plant at Guayaquil; (9) at the time of making such agreement with Malone, Gillum had actual knowledge that Weed had made a contract with Universal concerning the operation of such plant; (10) thereafter Gillum advanced money to Malone to carry out their agreement; (11) the agreement between Gillum and Malone was made with intent to deprive Universal of its rights under the contract of May 3, 1967; (12) in making such agreement Gillum acted with malice; (13) such agreement caused Weed to terminate his contract with Universal; (14) funds were expended in behalf of Universal in attempting to perform its contract, (15) in an amount of $7,776.92; (16) the conduct of Malone pursuant to his agreement with Gillum was a proximate cause of the loss by Universal of the above amount; (17) if Weed had not terminated the contract of May 3, 1967 Universal would have realized net profits under said contract; (18) which in reasonable probability would have amounted to $255,000, (19) which loss of profits was caused by Malone, pursuant to his agreement with Gillum; (20) as exemplary damages Gillum should pay Universal $85,000.

Following the return of the jury verdict appellants filed a motion for judgment based on the verdict. Gillum filed motions for judgment notwithstanding the verdict and that the court disregard the jury's answers to all special issues except Nos. 3A and 3B. Weed filed a motion asking the court to disregard the jury's answers to certain issues and to render judgment in his favor that appellants take nothing.

The court overruled appellants' motion for judgment on the verdict and sustained Gillum's motion as to all issues except Nos. 3A and 3B. Judgment was then rendered against Weed for $7,000 and that appellants recover nothing against Gillum and no other damages on their claim against either Weed or Gillum.

Weed has not appealed from the judgment for $7,000 against him. In fact he prays that said judgment be affirmed.

We have concluded that the judgment of the trial court should be affirmed.

In four points on appeal appellants allege that the court erred in (1) rendering judgment N.O.V. in favor of appellee Gillum because the evidence was sufficient to sustain the jury's findings relating to a conspiracy between Gillum and Malone to interfere with contractual rights of appellants; (2) disregarding the jury's answers to certain special issues and in rendering judgment N.O.V. relieving Weed and Gillum of liability for damages for lost profits because the evidence was sufficient to support the jury's finding of loss of net profits in the amount of $255,000; (3) rendering judgment N.O.V. because the evidence supports the jury's assessment of $85,000 exemplary damages; and (4) rendering judgment N.O.V. where said motions for judgment were filed on the same date that judgment was rendered and appellants were given no prior notice thereof.

In answer to the above points appellee Gillum presents twenty-six counterpoints and Weed eleven counterpoints.

### FACTS

The nature of appellants' points on appeal requires us to make a careful analysis of the facts in this case.

In the spring of 1967 Harold A. Weed, a resident of the State of Arizona, owned two seafood processing plants and about thirty fishing boats in Ecuador. He had acquired these properties as a creditor of the prior owner. Weed himself was in financial straits. He badly needed money as operating capital and needed it immediately. He testified that he was "broke" financially. He was faced with the necessity of closing down one or both of his processing plants.

Don Tugwell, who had been instrumental in getting Weed involved as a creditor of the prior owner, introduced Weed to Jerry E. Young, Lloyd F. Sneed, Jr. and James Malone of Dallas, Texas. These three men were persuaded to go into the business of processing and selling shrimp and fish from the Guayaquil processing plant. To that end as equal stockholders they formed a Texas corporation called Universal Commodities, Inc., with Malone as President, Young as Vice-President and Sneed as Secretary-Treasurer.

Soon thereafter Universal, acting by and through its President, Malone, signed the contract dated May 3, 1967 whereby Weed leased the Guayaquil processing plant to Universal for a period of five years. By the terms of the contract Weed was to obtain raw shrimp and raw fish by the use of his fishing boats and to sell them to Universal in quantities adequate to supply the needs of Universal. He was to supply Universal with a minimum of 50,000 pounds of raw shrimp and 50,000 pounds of fish per month at a price of seven cents per pound. The purchase from Weed and payment to Weed for these seafood products was to be the rental paid by Universal. However, Universal was to pay Weed at least $5,000 per month as rental regardless of the amount of production of the leased plant.

Neither Young, nor Sneed, nor Malone had ever had any experience in the operation of a plant for processing shrimp and fish.

Universal and the three men who had organized it ran into financial difficulties at once. The contract with Weed dated May 3, 1967 had been signed in behalf of Universal before any financing arrangements had been made. Universal had no operating capital. Neither did its three organizers, Young, Sneed and Malone. They had organized the corporation and signed the contract hoping that they could obtain financing. They never succeeded in doing so. The jury's answers to Special

Issues Nos. 3A and 3B are amply supported by the evidence. The necessity of obtaining operating capital was an overpowering problem. Wilfredo H. Brito, Jr. was experienced in the shrimp and fish processing business both in the United States and in other countries, including Ecuador. His opinion was that Weed would require $100,000 operating capital for his thirty fishing boats and Universal would need $100,000 operating capital for its processing plant. The lowest of any other estimates was $25,000 to $50,000.

Meantime Weed was bombarding Young, Sneed and Malone with urgent demands for money. Young and Sneed succeeded in borrowing $7,000 on their personal note. This sum was sent to Weed.

It was necessary for Universal to obtain purchasers for the processed seafoods which it was hoped the plant would produce. Young contacted various prospective customers, including Wilfredo H. Brito, Jr., President and General Manager of Inter-American Foods, Inc. Brito in behalf of his company orally agreed to purchase the output of the Guayaquil processing plant. However his agreement was subject to several conditions: he entered only into oral agreements, usually by telephone, for no specific term; he required samples; shrimp must have the approval of F.D.A. (Food & Drug Administration of the United States Government); quality and color of shrimp must be satisfactory; the price must be acceptable; and the product should be packaged in a certain way.

One set of samples was forwarded to Brito, but they were rejected because they arrived in a thawed condition. Brito subsequently waived the requirement of samples. But no shipments of shrimp were ever made to Brito's company.

Young discussed his financing problem with Brito, whose company was able to finance shrimp suppliers—again subject to certain conditions. One of these condi-

tions was that Brito's lawyer in Ecuador would have to check over Universal's "papers" to see that the requirements of the laws of Ecuador in regard to foreign corporations had been met. It was Brito's practice to cause letters of credit to issue to enable suppliers to send him shipments of frozen shrimp. He made such an offer to Young, but Young declined the offer.

Brito's offers to purchase Universal's shrimp and to help finance Universal in purchasing shrimp from Weed were never really accepted. Brito's company received no shipments and made no purchases from Universal, or its three organizers. In fact Young in effect abandoned his effort to do business with Brito's firm. Brito was present at the trial of this case at Young's request and he testified as a witness for Universal and Young. We quote from Brito's testimony:

"Q All right, what was the ultimate outcome with regard to furnishing of samples; in other words, were you ever furnished samples?

A No, because later on, Jerry told me, 'Look, let's forget about this—*forget about all of this, I have got problems, and I can't produce the shrimp.*' And I said 'Jerry, I am glad you said that, because we have spent enough money on phone calls, so forget about it. If you can't produce the shrimp, call me when you are ready again.'" (Emphasis ours.)

On May 23, 1967 Weed sent a letter to Universal cancelling the contract of May 3, 1967 because of nonperformance.

Meantime the problems confronting the new business enterprise had become further aggravated when the three stockholders and officers of Universal, Young, Sneed and Malone, were split by dissension. Their falling out was serious. Young accuses Malone of working at cross-purposes against his fellow officers, and of fraudulent concealment including false statements. Malone informed Young that

he was resigning as President of Universal. Stock certificates of Universal were never issued to the three stockholders.

On June 8, 1967 Malone, having obtained control of Texas Cattle Corporation, of which he had become President, signed a contract with Weed in behalf of Texas Cattle Corporation. This contract in its terms and conditions was substantially like the contract of May 3, 1967 which Malone had signed in behalf of Universal.

Appellants allege that Dr. Randolph Gillum was a co-conspirator with Malone and Weed in interfering with the May 3, 1967 contract between Weed and Universal. We find no evidence to support appellants' claim.

Dr. Gillum is a practicing physician living in Mesquite, Texas, a thriving municipality located in Dallas County adjacent to the City of Dallas. He was introduced to Young and Malone by Gene Bruton, a mutual friend. Bruton had suggested that Young and Malone might be able to interest Gillum in investing money, perhaps $50,000, in their shrimp processing venture in Ecuador.

Young and Malone and later Malone alone tried to persuade Gillum to finance the Guayaquil shrimp processing undertaking. They were not successful. However Gillum was giving serious consideration to the matter. He ascertained through Smith, his attorney, and Bruton that the processing plant in Ecuador actually was in existence. Though he refused to invest in the enterprise he did lend Malone $15,000, evidenced by a note and deed of trust lien on land in Tennessee. He testified that Malone had paid back $10,000 on the loan.

At the time he borrowed the $15,000 from Gillum, Malone indicated he needed to form a corporation to handle his business. Gillum with two other doctors had formed a corporation in 1963 called Texas Cattle Corporation, Inc. This corporation never became active. No stock was ever issued

to the incorporators. Gillum told Malone he could have the corporation if he would pay the franchise tax and have his attorney draw up the necessary transfer papers. This was done. Malone became President of Texas Cattle Corporation, Inc. Gillum owns no stock in the corporation and has no interest in it.

Gillum testified that while he was being importuned by Young and Malone, and later by Malone alone, he did not know that a contract had been entered into between Weed and Universal. Though Gillum was an interested party we believe his testimony may be accepted as a fact because it was clear and positive and finds support in testimony offered by appellants. We quote from Young's testimony:

"Q Did you tell him that you had a contract, that Universal Commodities had a contract—

A No.

Q For a fish processing plant?

A No, I told him we were entering into one.

Q Did you use Universal Commodities' name or was this that you and Mr. Malone were entering into?

A I don't recall.

Q Did you ever write a letter advising Dr. Gillum of this fact?

A No, I did not.

Q You were suspicious of Mr. Malone?

A Yes, I was.

Q But you never wrote Gillum a letter of this fact? Advising him of this fact?

A No, I didn't.

Q Did you ever tell Dr. Gillum that you had a contract with Mr. Weed?

A No, I did not.

Q To your knowledge, did Mr. Sneed?

A Not to my knowledge.

Q *Did you ever overhear Mr. Malone ever tell him that there was a contract?*

A *Not that I recall.*

Q *Do you know of anyone that informed Dr. Gillum of Universal Commodities' contract with Harold Weed?*

A *Mr. Malone stated that he had told him.*

Q *Well, I'm asking you if you know of your own knowledge anybody that informed Dr. Gillum of this fact?*

A *In my presence?*

Q *Yes, not what somebody told you, but what you know of your own knowledge?*

A *No."*

\* \* \* \* \* \*

Q *Describe the conversation that occurred in that regard.*

A *I asked him did he see him and he said, yes, and I asked him did he make Dr. Gillum aware that we had a contract, and he said yes."* (Emphasis ours.)

It will be observed that the latter part of the above quoted testimony—where Young said that Malone said that he had told Gillum about the contract—is pure hearsay. The testimony of Weed and Sneed does not remotely suggest that Gillum knew the contract had been entered into.

Appellants contend that Bruton was Gillum's agent, that Bruton knew the contract of May 3, 1967 had been signed and such knowledge on his part is to be imputed to his principal, Gillum.

The evidence does not bear out appellants' contention. Gene Bruton had formerly been an officer of the Commerce National Bank. At the times involved herein Bruton was connected in some manner with Mesquite General Hospital and also with an investment corporation. Gillum along with other persons owned stock in both corporations. Again we quote from Young's testimony:

"Q Now, to you, did Dr. Gillum ever make any statements concerning how much he was going to pay Gene Bruton?

A No, he did not.

Q Did he ever tell you that Gene Bruton was his employee?

A He didn't tell me, no.

Q Did he ever hold Gene Bruton out to be any more than a friend of yours to you?

A Not to my knowledge.

Q Do you know whether he held Gene Bruton out to be anything more than a friend of his to anybody concerning this transaction?

A. No."

Subsequently Young met B. J. Smith and Bruton in Ecuador. The latter two had gone to Ecuador at Gillum's request but at Malone's expense for the limited purpose of ascertaining whether in fact the processing plant actually was in existence at Guayaquil. They verified the fact that it was in existence. Again we quote from Young's testimony.

"THE COURT: The question was, what did you tell Mr. Bruton or Mr. Smith or both of them?

A I asked them how they liked Ecuador and they said it was a very nice country, but quite dead, and I asked Mr. Bruton at this time if he had seen the plant, and he said yes, he had, and then I asked him if he thought that the doctor would invest and he said, 'Yes, I think he will, as soon as we get back and talk to him.' "

In their brief appellants say that Gillum testified that Bruton was his manager. Again the testimony does not support appellants. We quote the pertinent portion of Gillum's testimony:

"Q Who is Mr. Bruton?

A He is just a friend of mine, works out at Mesquite.

Q Are you associated with Mr. Bruton in any manner?

A Yes. He works in a professional investment corporation that I have an interest in.

Q Does he manage the corporation?

A I guess you could call him manager.

Q How long have you been engaged in that with him?

A I think he has been working in that business about a year, approximately."

The above quoted testimony is certainly not evidence that Bruton was Gillum's manager. The testimony refers to Bruton as possibly the manager of the investment corporation in which Gillum owned some stock, but not to Bruton as Gillum's manager.

Appellants' Exhibit No. 2 is a document designated as a "Profit Projection". It is really a prospectus which was shown by Weed to Young, Sneed and Malone to induce them to lease the Guayaquil processing plant. It was later shown by Young to Gillum in an effort to persuade Gillum to invest $50,000 in the project. It purports to show the estimated fixed cost of shrimp and fish and then painted a glowing picture of prospective profits as "Estimated Total Yearly Profit." The court would not admit this document as evidence against Gillum. It was admitted as to Weed.

## OPINION

The court properly denied appellants any recovery for the loss of future profits. Universal and its three corporate stockholders and officers were attempting to start a new business. The general rule is that the loss of anticipated profits from a new business is too speculative and conjectural to support a recovery of damages. Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097 (1938); Barbier v. Barry, 345 S.W.2d 557, 563 (Tex.Civ.App., Dallas 1961, no writ). It is true that lost profits will not be denied merely because a business is new if factual data is available to furnish a sound basis for computation of probable losses. Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340, 348 (1955), which involved a new business actually established and operated for a while. But in the case now before us the undisputed evidence shows that there was no basis for the recovery of damages for loss of anticipated profits. We have so concluded for these reasons:

1. Universal and its three owners were never able to raise the money necessary to finance their contemplated business. The evidence is undisputed on this point. Moreover the jury so found in its answers to Special Issues 3A and 3B.

2. Universal never bought or sold a pound of shrimp or fish nor was it ever even able to take over possession of the processing plant in Guayaquil.

3. The three stockholders and officers of Universal had never had any experience whatever in the management or operation of a shrimp or fish processing plant.

4. No attempt was made to ascertain whether the contract of May 3, 1967 complied with the laws of Ecuador.

5. Though appellants' Exhibit No. 2 was received in evidence as to Weed, it was rejected by the court as to Gillum. Had it been admitted in evidence as to Gillum we would hold that it is too speculative and conjectural to form the basis of any lost profits.

Appellants rely on the provision in the contract which according to appellants

"guarantees" a profit for Universal. We attach no probative weight to such alleged "guarantee" for these reasons:

1. It is not really a guarantee. Weed merely undertakes to sell seafood to Universal at a competitive price which will *permit* Universal to make a net profit of five cents per pound. Universal was required to pay cash for said seafood products upon delivery to the leased premises. This Universal was never able to do.

2. Whether appellants could have or would have made a profit would still depend on their managerial skill.

3. If we were to construe the provision as a true guarantee (which we do not) it would be worthless for Weed was admittedly "broke" financially.

4. By the terms of the contract if Weed should fail to supply sufficient seafood products to Universal, the latter would not have the right or option to cancel the lease until the expiration of sixty days. Meantime the minimum rental would be waived.

■ We find no evidence whatever of malice on the part of Weed or Gillum. There is no basis for the recovery of exemplary damages.

■ Neither do we find any evidence of probative value that Gillum entered into any conspiracy to interfere with the contract of May 3, 1967 between Weed and Universal. The "no evidence" rule is applicable before the court may properly instruct a verdict, or render a judgment *non obstante veredicto*, or disregard a jury's answers to certain issues. But the "no evidence" rule does not mean exactly what its name might suggest. The real meaning of the rule is tersely stated by our Supreme Court in the landmark case of Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898), as follows:

"From a careful examination of the cases, it appears (1) that *it is the duty of the court to instruct a verdict, though*

*there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence';* and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force." (Emphasis ours.)

The court cited several cases holding that a scintilla of evidence is not enough to support a submission to a jury. See also Waco Drug Co. v. Hensley, 34 S.W.2d 832, 836 (Tex.Comm'n App.1931); Gager v. Reeves, 235 S.W.2d 688, 689 (Tex.Civ. App., Fort Worth 1950, writ ref'd n. r. e.); Caufield v. El Paso Times, 280 S.W.2d 766, 772 (Tex.Civ.App., Austin 1955, no writ); Terrell v. Olsen, 378 S.W.2d 719, 722 (Tex. Civ.App., San Antonio 1964, no writ), citing cases; Switzer v. Joseph, 442 S.W. 2d 845, 850 (Tex.Civ.App., Austin 1969, no writ). The existence of a conspiracy may be proved by circumstantial evidence, but the evidence must be full, clear, satisfactory and convincing. Disconnected circumstanes will not do. Gager v. Reeves, supra; Switzer v. Joseph, supra. If there is any at all in this case of a conspiracy involving Gillum it is not more than a scintilla of evidence. At most it raises no more than a mere surmise or suspicion.

■ Young's statement that Malone stated that he told Gillum of the existence of the contract of May 3, 1967, not having been uttered in the presence of Gillum, is mere hearsay in the absence of the establishment by other evidence of the fact of a conspiracy involving Gillum. Cranfill v. Hayden, 97 Tex. 544, 80 S.W. 609, 616–617 (1904); Reliance Ins. Co. v. Smith, 66 S.W.2d 675 (Tex.Comm'n App.1933, opinion adopted); North River Ins. Co. v. Daniel, 101 S.W.2d 401 (Tex.Civ.App., Waco 1937, no writ); Caufield v. El Paso Times, supra; Terrell v. Olsen, supra. Being hearsay it is no evidence at all. Belverman v. State, 16 Tex. 130 (1856);

Stringfellow v. Montgomery, 57 Tex. 349 (1882); Henry v. Phillips, 105 Tex. 459, 151 S.W. 533 (1912); Texas Co. v. Lee, 138 Tex. 167, 157 S.W.2d 628, 631 (1941); Clary v. Morgan Motor Co., 246 S.W.2d 936 (Tex.Civ.App., Fort Worth 1952, no writ); James v. Eagle Rock Ranch, 304 S.W.2d 471 (Tex.Civ.App., Austin 1957, no writ); Cooper v. Neon Electric Co., 342 S.W.2d 595 (Tex.Civ.App., Houston 1961, no writ); Lawson v. Baker, 351 S.W.2d 571 (Tex. Civ.App., Houston 1961, no writ); Bohannon v. Franklin National Bank, 387 S.W.2d 699 (Tex.Civ.App., Dallas 1965, no writ).

■ Appellants complain that the motions for judgment *non obstante veredicto* and that the court disregard the answers to certain issues were filed and argued the same day without prior notice to them. Their complaint is without merit under the circumstances presented here. We so hold for these reasons:

1. Appellants did not ask for a postponement of the hearing, but participated in a full argument on the motions.

2. The error, if it was error, must be held to be harmless in the light of the undisputed evidence.

We have held that there was "no evidence" to support appellants' claims of conspiracy, loss of profits or exemplary damages. But if it should be said that we were mistaken in so holding we would certainly find that the evidence was insufficient to support the jury's findings, that is, that answers of the jury in all material matters relating to loss of profits and exemplary damages, and any damages whatever as to Gillum, are so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong.

Since Weed has not appealed from the judgment against him for alleged breach of contract the judgment against him in the amount of $7,000 will be affirmed. The judgment in favor of Gillum that appellants take nothing against him will also be affirmed, as will the judgment that no other recovery be had against any of the defendants.

Affirmed.