**FIRST TITLE COMPANY OF WACO, et al., Appellants,**

v.

**Charles GARRETT, et ux., Appellees.**

**No. 10–89–228–CV.**

Court of Appeals of Texas, Waco.

July 31, 1990.

Rehearing Overruled Sept. 13, 1990 and Oct. 25, 1990.

Michael W. Huddleston & R. Michael Northrup, Cowles & Thompson, Dallas, for appellants.

Andy McSwain, Greg White, McGregor, White, Malesovas & McSwain, Waco, for appellees.

## OPINION

THOMAS, Chief Justice.

Charles and Dorinda Garrett sued Alamo Title Insurance of Texas and its agent, First Title Company of Waco, for misrepresenting in a title commitment that the property purchased by the Garretts was not affected by any recorded restrictive covenant. The judgment, which includes damages for mental anguish, lost profits and interest expense, is based on jury findings of two "laundry list" violations of the Deceptive Trade Practices Act (DTPA) and a finding of a negligent failure to discover and disclose the restrictive covenant. It will be affirmed.

The Garretts bought a nine-acre tract from Raymond Jenkins and James Dameron to be used as an auto wrecking yard. However, the property could not be used for that purpose because of a restrictive covenant contained in the deed by which Jenkins and Dameron acquired the property. First Title failed to discover the restrictive covenant during its title search, and Alamo Title affirmatively represented in the title commitment that no restrictive covenants appeared of record. Alamo Title later issued its title policy to the Garretts after the purchase was completed. After being enjoined from using the property as a wrecking yard, the Garretts sued First Title and Alamo Title for violating the DTPA and for negligently failing to discover and disclose the restrictive covenant.

Point one is that the court erred when it refused to grant the defendants a judgment notwithstanding the verdict. Essentially, First Title and Alamo Title argue that: (1) they were not liable as a matter of law under a negligence theory because they owed no duty to the Garretts to discover and disclose the restrictive covenant; and (2) they were not liable as a matter of law under the DTPA because a provision in the title commitment prevented the Garretts from relying on the misrepresentation. They insist that the Garretts could only recover under the title policy, which limited the amount and type of damages.

■ Ordinarily, a title insurance company does not owe a duty to the insured to discover and disclose a title defect. *Stewart Title Guar. Co. v. Cheatham*, 764 S.W.2d 315, 319 (Tex.App.—Texarkana 1988, writ denied). However, Rule P-4 of the State Board of Insurance's rules requires a title insurer to list all restrictive covenants and where they are recorded or to affirmatively state that there are "None of Record." State Board of Insurance, 28 TEX.ADMIN.CODE § 9 (West 1989) (Title Insurance). This requirement places a duty on the insurer to discover and disclose restrictive covenants, and creates an exception to the general rule of no duty to disclose. W. Dorsaneo, 11 Texas Litigation Guide § 256.04[3][a] (1990). Alamo Title owed and breached a duty to the Garretts to discover and disclose the restrictive covenant.

■ A distinction exists under the DTPA between an affirmative misrepresentation and a failure to disclose information. *Robinson v. Preston Chrysler–Plymouth, Inc.*, 633 S.W.2d 500, 502 (Tex.1982). A person has a duty to know if his representations are true, but if he merely fails to disclose information, he has no duty to know the existence or truth of undisclosed facts. *Id.* Thus, a title insurer can be

liable under the DTPA for affirmatively misrepresenting that a title defect does not exist, even if it owes no duty to discover and disclose the defect. *Stewart Title Guar. Co. v. Sterling,* 772 S.W.2d 242, 246 (Tex.App.—Houston [14th Dist.] 1989, writ granted); *Gibbs v. Main Bank of Houston,* 666 S.W.2d 554 (Tex.App.—Houston [1st Dist.] 1984, no writ). Alamo Title's misrepresentation, that no restrictive covenants appeared of record, was actionable under the DTPA regardless of whether it owed a duty to disclose the defect to the Garretts. *See Sterling,* 772 S.W.2d at 246.

■ In *Cheatham* the jury found that the title insurer represented to the insured that a title policy, which failed to disclose an easement, conferred or involved characteristics, uses or benefits which it did not have or involve. *Cheatham,* 764 S.W.2d at 317. Although a preliminary title report affirmatively misrepresented that there were no easements affecting the property, the report contained this provision:

CAUTION: PROTECTION IS AFFORDED ONLY UNDER THE TERMS OF THE PROPOSED POLICY. STEWART TITLE GUARANTY COMPANY ASSUMES NO LIABILITY FOR ERRORS OR OMISSIONS IN THIS REPORT OR FOR VERBAL STATEMENTS. This is a copy of a preliminary report made for use of Stewart Title Guaranty Company only, to determine whether a title insurance policy can be issued. If a copy is furnished to the parties to the transaction it is to facilitate preparation of the necessary instruments, to point out curative requirements, if any, and to show the results of the Company's title search (*upon which only the Company may rely*). *None of the information contained herein, or the absence of other information, constitutes a representation to any party, other than the Company, as to the status of the title. If a title defect or encumbrance should exist which is not disclosed hereon, the Company shall not be liable by reason of furnishing this report or for any verbal statements related thereto.* The Company shall not be liable for any title defect unless a title insurance policy is

hereafter issued by it, insuring against such defect, and the applicable premium paid therefor, and the Company's liability then shall exist only under the terms of its policy ... and as measured and limited thereby.

(Emphasis added). *Id.* at 320.

The *Cheatham* court held there was no evidence to support a finding that the insurer represented that the title policy conferred or involved characteristics, uses or benefits which it did not have or involve. *Id.* at 321. Specifically, the court ruled that the plaintiff could not rely on the misrepresentation in the title report:

In the present case, it appears that the defendant not only did not invite such reliance, but clearly warned against it in its title report.... [The title report] clearly was not prepared or furnished for Cheatham's use or reliance.

\*　　\*　　\*　　\*　　\*　　\*

The policy invites reliance only for the purpose of being indemnified in accordance with the policy.

*Id.* at 320–21.

Relying on *Cheatham,* First Title and Alamo Title argue that the following provision, printed in bold letters on the first page of the title commitment, insulated them from any liability under the DTPA for misrepresenting that the property was not affected by any restrictive covenants:

4. THE POLICY TO BE ISSUED PURSUANT TO THIS COMMITMENT DOES NOT GUARANTEE THAT THE INSURED PROPERTY HAS ADEQUATE TITLE TO ALLOW IT TO BE *USED*, SOLD, TRANSFERRED, LEASED OR MORTGAGED *FOR ANY PURPOSE INTENDED BY THE PURCHASER* NOR WILL IT PROVIDE COVERAGE FOR POSSIBLE LOSS OF OPPORTUNITY OR ECONOMIC EXPECTATION. IN THE EVENT OF A PARTIAL FAILURE OF TITLE, WHICH MAY SUBSTANTIALLY AFFECT THE USE OR MARKETABILITY OF THE PROPERTY, THE COMPANY MAY BE REQUIRED TO PAY ONLY THE PRO-

RATA PART OF THE AMOUNT OF THE POLICY TO BE ISSUED WHICH THE TITLE DEFECT BEARS TO THE ENTIRE INSURED PROPERTY.

(Emphasis added).

*Cheatham* is not controlling for two reasons. First, assuming that a defendant can protect itself from an affirmative misrepresentation by a disclaimer against representations or by a caveat against reliance, the provision in the title commitment bears no similarity to the provision in *Cheatham.* The provision relied on by First Title and Alamo Title does not disclaim any representation about the status of the title or caution or warn against relying on the accuracy of any statement relating to the status of the title.

 Second, *Cheatham* will not be followed to the extent that it allows a defendant to protect itself from DTPA liability by a disclaimer against representations or by a caveat against reliance. Such a result would only encourage deceptive trade practices and be at odds with the public policy expressed in section 17.42. TEX.BUS. & COM.CODE ANN. § 17.42 (Vernon Supp. 1990); *Hycel, Inc. v. Wittstruck,* 690 S.W.2d 914, 922 (Tex.App.—Waco 1985, no writ). Except for a disclaimer against warranties, a defendant cannot limit its DTPA liability by a contractual provision. *G–W–L, Inc. v. Robichaux,* 643 S.W.2d 392, 393 (Tex.1982); *Hycel, Inc.,* 690 S.W.2d at 922. First Title and Alamo Title were not entitled to a judgment as a matter of law based on the printed provision in the title commitment. Point one is overruled.

 Points two and three attack the legal and factual sufficiency of the evidence supporting findings that First Title represented that the property had approval, characteristics, uses, benefits or qualities it did not have and was of a particular standard, quality or grade when it was of another. *See* TEX.BUS. & COM.CODE ANN. § 17.46(b)(5), (7) (Vernon 1987). First Title and Alamo Title essentially contend, as they did under the first point, that there was no evidence of a misrepresentation because of the provision that allegedly precluded the Garretts from relying on the affirmative statement that no restrictive covenant appeared of record. This contention was rejected in the disposition of point one.

Uncontroverted evidence established that the title commitment contained a false representation that the property was not affected by any restrictive covenants. Charles Garrett testified that he reviewed the representation in the title commitment prior to completing the purchase, that he relied on the representation, and that he would not have purchased the property if he had known it was false. This evidence was legally and factually sufficient to support a finding of the two laundry-list violations. *See id.* Points two and three are overruled.

 The court instructed the jury in connection with the damage question that "you are not to consider any language in any document which appears to limit either the amount or type of damages which may be recovered." First Title and Alamo Title objected that the instruction was a "comment on the weight of the evidence" and put "undue prejudice on the notice provision" in the title commitment. They complain in the fourth point about the court overruling their objection.

This was a suit under the DTPA and for negligence, not a suit on the title policy. Although the title policy would govern a recovery in a suit on the policy, its provisions could not limit the type or amount of damages recoverable under the DTPA or for negligence. *See Martin v. Lou Poliquin Enterprises, Inc.,* 696 S.W.2d 180, 185–86 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). Point four is overruled because the instruction was correct.

The damage question allowed the jury to award: (1) the difference between the fair market value of the property (as improved) and the reasonable amount paid for the property (with necessary improvements); (2) lost profits; (3) mental anguish; and (4) interest expense. The fifth point is that the court submitted an improper measure of damages. Using the same reasoning

advanced under other points, First Title and Alamo Title argue that the title policy controlled the amount and type of damages the jury could award because the Garretts had no negligence or DTPA cause of action. They contend the policy not only limited their maximum liability to $46,-318.20, the property's purchase price, but precluded any recovery of lost profits, mental anguish or interest expense. This argument was rejected in point four. Point five is overruled.

First Title and Alamo Title question in their sixth point whether the evidence was factually sufficient to support an award of $8,000 for mental anguish. Mental anguish requires a high degree of mental suffering and an intense pain of body or mind, i.e., something more than mere worry, anxiety, vexation or anger. *Freedom Homes of Texas, Inc. v. Dickinson*, 598 S.W.2d 714, 718 (Tex.Civ.App.— Corpus Christi 1980, writ ref'd n.r.e.).

Charles Garrett testified that his wife had "been on tranquilizers and been to the doctors, psychologists and all" as a result of "this and other things" and had "changed in a physical way ... in terms of sleep [and] eating." He said that she was not the "same person she had been" and that they had "problems" with their marriage because of "this." Dorinda Garrett said that her husband was affected to such an extent that he had trouble sleeping and difficulty in his relationships with her and their children. She claimed to have been adversely affected both mentally and physically.

This was evidence of more than mere worry, anxiety, vexation or anger on their part. The jury could have reasonably concluded that their mental anguish manifested itself in physical symptoms from a high degree of mental suffering and intense pain of body and mind. *See id.* Thus, the evidence was factually sufficient to support an $8,000 award for mental anguish. Point six is overruled.

The seventh point attacks the factual sufficiency of the evidence supporting an award of $30,000 for lost profits. First Title and Alamo Title contend that lost profits could not be established with reasonable certainty because the Garretts' business was new.

Lost profits are recoverable only if they can be shown with reasonable certainty by competent evidence. *Southwest Battery Corporation v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938). Lost profits of a new or unestablished business usually cannot be recovered because they cannot be shown with reasonable certainty. *Id.* at 1099. However, if factual data is otherwise available to furnish a sound basis for computation, then lost profits can be recovered for even a new business. *Universal Commodities, Inc. v. Weed*, 449 S.W.2d 106, 113 (Tex.Civ.App.— Dallas 1969, writ ref'd n.r.e.); *see Pace Corporation v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 348 (1955).

Charlie Garrett was an experienced auto mechanic, knew the auto-parts business from first-hand experience in buying and selling used automobiles and parts, and had considerable experience in the wrecking-yard business before he purchased the property. This was the kind of knowledge and experience, witnesses testified, that was needed to successfully operate his own business.

Garrett and other witnesses testified about the average cost of wrecked cars, the average number of cars that can be stored per acre, the average number of years before Garrett would have filled his eight-acre wrecking yard with cars, and the average number of cars that Garrett would "part out" or "crush" each year. Their testimony also covered the average revenue from the sale of parts from wrecked cars or from crushing cars after their usable parts had been sold and the average net profit in the wrecking-yard business.

Furthermore, Garrett had actually operated a wrecking-yard and parts business on the nine acres for a period of time before he was enjoined from using the property for that purpose. He said his business "took off like a rocket," which required him to hire a mechanic so that he could devote full time to the wrecking-yard and

parts business. His gross-profit was seventy-eight percent on the autos he bought and sold during that time.

Using this evidence as a basis for computations, a certified public accountant prepared an estimate of lost profits based on the following assumptions: (1) Garrett would have used eight of the nine acres to store wrecked cars; (2) a total of 800 cars, i.e., 100 cars per acre, would have been stored on the property; (3) the eight acres would have been filled with 800 cars within two to four years; (4) 200 to 300 of the 800 cars would have been "turned over" each year by the sale of parts and crushing; (5) the average cost of the cars would have been $500 each; (6) the average revenue received for each crushed car would have been $80; (7) the average sales of parts per car would have been $1,000, i.e., a 100–percent gross profit; and (8) annual net profits would have averaged twenty percent of gross revenue. The evidence supported these assumptions, and even the defendants' expert agreed with their reasonableness, except for the net-profit percentage. Any question about the reasonableness of the methodology used to compute lost profits or the factual basis supporting it affected its weight and not its admissibility. *See State Nat. Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 695 (Tex.App.—El Paso 1984, writ dism'd by agr.).

Regardless of whether the Garretts' business was new or established, sufficient factual data was introduced into evidence to furnish a sound basis for computing lost profits with reasonable certainty. Not only was the methodology used to estimate lost profits reasonable and logical, but the amount of the award was well within the evidence. In an area where any estimate is inherently speculative, mathematical exactness is not required. *White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d 260, 262 (Tex.1983). First Title and Alamo Title cannot escape liability merely because the Garretts could not prove an exact and perfect measure of damages. *See Pace Corporation,* 284 S.W.2d at 348. Accordingly, point seven is overruled because the evidence was factually sufficient to support the award of lost profits.

First Title and Alamo Title generally assert in their eighth point that the evidence was factually insufficient to support the damage findings. Noting that the Garretts owned and were using the property at the time of the trial to operate a business of selling and repairing cars, they argue that the Garretts would have incurred the same interest expense on loans used to purchase and improve the property, regardless of whether they used the property for a wrecking yard or an auto-repair and used-car business.

Although the parties stipulated that the Garretts had paid $16,109.88 in interest on notes executed to purchase and improve the property, the jury only awarded $8,000 of interest. Accordingly, one cannot conclusively say that the jury did not reduce the interest awarded to reflect that the Garretts would have incurred some interest expense based on the use they were actually making of the property. The evidence was factually sufficient to support an award of $8,000 in interest expense.

Finally, First Title and Alamo Title attack the factual sufficiency of the evidence supporting the damage findings by arguing that they were entitled as a matter of law to offset against the judgment the money which the Garretts recovered in a suit against Jenkins and Dameron, the sellers of the property. This argument, which is the basis of the ninth and tenth points, does not relate to the factual sufficiency of the evidence, and will not be considered here. Point eight is overruled.

Prior to their suit against First Title and Alamo Title, the Garretts recovered $62,000 in a separate suit against Raymond Jenkins and James Dameron. First Title and Alamo Title sought to offset or credit the $62,000 against the judgment in this suit. Their ninth point is that the court erred when it refused to grant the offset as a matter of law.

First Title and Alamo Title waived any right to benefit from the Garretts' recovery against Jenkins and Dameron by their failure to request the submission of and obtain findings on a percentage-causa-

tion question. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 431–32 (Tex. 1984); *Sterling*, 772 S.W.2d at 248. Point nine is overruled.

 First Title and Alamo Title argue in their tenth point that the court erred when it excluded evidence of the Garretts' recovery against Jenkins and Dameron. Essentially, their complaint is that they were entitled to introduce evidence of the $62,000 recovery to impeach Charles Garrett's claim that he was in "financial trouble."

Garrett admitted on cross-examination, without identifying the source of the payment, that he received $40,000 in August 1987. That was the amount he received from the $62,000 settlement after the payment of attorney's fees. Considering that the jury was aware of the $40,000 payment, which bore on Garrett's claim of "financial trouble," any error arising from the court's refusal to allow the defense to expose the details of the settlement was harmless. *See* TEX.R.APP.P. 81(b)(1). Point ten is overruled.

 Finally, the question in point eleven is whether the Garretts failed to timely designate their certified public accountant as an expert witness. Trial was originally scheduled for May 15, 1989, but did not actually begin until May 22. The Garretts designated their expert witness in a supplemental answer to written interrogatories mailed on April 13. First Title and Alamo Title did not receive the supplemental answer until April 17 and 18.

The Garretts designated their expert more than "thirty days prior to the *beginning* of trial," which made the designation timely. *See* TEX.R.CIV.P. 166b(6) (emphasis added). Point eleven is overruled. The judgment is affirmed.

## OPINION ON REHEARING

 The court refused to credit $62,000, the amount the Garretts received in settlement of a separate suit against Jenkins and Dameron, against the judgment in this suit. First Title and Alamo Title claimed they were entitled to the credit under the "one satisfaction rule" [1] in *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703, 705 (Tex.Comm'n App.1935, opinion adopted). Relying on *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 434 (Tex.1984), and *Stewart Title Guar. Co. v. Sterling*, 772 S.W.2d 242, 248 (Tex.App.—Houston [14th Dist.] 1989, writ granted), this court held that they waived their right to the credit by failing to obtain a comparative-causation finding of Jenkins' and Dameron's liability.

First Title and Alamo Title contend on rehearing that *Duncan* only applies when at least one defendant is strictly liable. They point out that they were not strictly liable. They also argue that *Sterling* misapplied *Duncan* because none of the *Sterling* defendants were strictly liable. Regardless of whether *Duncan* was correctly applied by this court or in *Sterling*, First Title and Alamo Title were not entitled to the credit because they failed to establish that Jenkins and Dameron were joint tortfeasors.

The opinion in *Cypress Creek Utility Service Co. v. Muller*, 640 S.W.2d 860, 862 (Tex.1982), provides a historical perspective of the settlement credit, which evolved as a means of ameliorating the harshness of the common-law rule that prohibited contribution between joint tortfeasors. Although the right of contribution did not exist under common law, courts began deducting the plaintiff's settlement with a joint tortfeasor from the judgment against the non-settling tortfeasor based on the principle that the plaintiff was entitled to only one satisfaction of the damages found by the jury. *Id.*

Article 2212, later codified as chapter 32 of the Civil Practices and Remedies Code, was enacted in 1917 to abrogate the common law and provide contribution among

---

1. "[A]n injured party is entitled to but one satisfaction for the injuries sustained by him. That rule is in no sense modified by the circumstance that more than one wrongdoer contributed to bring about his injuries. There being but one injury, there can, in justice, be but one satisfaction for that injury." *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703, 705 (Tex. Comm'n App.1935, opinion adopted).

joint tortfeasors. TEX.REV.CIV.STAT. ANN. art. 2212 (Vernon 1971 and Vernon Supp.1985) (repealed 1985, current version at TEX.CIV.PRAC. & REM.CODE ANN. §§ 32.001–.003 (Vernon 1986)). However, the statute only applied to parties bound by the judgment. Therefore, if the plaintiff settled with a tortfeasor who was not liable under the judgment, then the non-settling defendant was still subject to the common-law prohibition against contribution. *Muller*, 640 S.W.2d at 862. When faced with that situation, the court in *Bradshaw v. Baylor University* deducted the plaintiff's settlement from the judgment. *Id.; Bradshaw*, 84 S.W.2d at 705. That approach was consistent with the action of courts prior to the enactment of article 2212.

In *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764 (Tex.1964), article 2212 was applicable because the settling tortfeasor was bound by the judgment. Under those circumstances, the Supreme Court rejected a dollar-for-dollar credit in favor of a proportionate reduction of the judgment based on the number of settling tortfeasors divided by the total tortfeasors. *Duncan*, 665 S.W.2d at 430.

Article 2212a, later codified as chapter 33 of the Civil Practices and Remedies Code, was enacted in 1973 to allow contribution between negligent joint tortfeasors based on the percentage of fault found by the jury. TEX.REV.CIV.STAT.ANN. art. 2212a (Vernon Supp.1985) (repealed 1985, current version at TEX.CIV.PRAC. & REM.CODE ANN. §§ 33.001–.016 (Vernon 1986 and Vernon Supp.1990)). Unlike article 2212, the legislature in article 2212a spelled out how settlements were to affect the judgment against the non-settling defendant. Section 2(d), which embodied the dollar credit in *Bradshaw v. Baylor University*, was applicable if the settling party's negligence was not determined by the jury. TEX.CIV.PRAC. & REM.CODE ANN. § 33.014 (Vernon 1986 and Vernon Supp.1990); *Muller*, 640 S.W.2d at 863. If the jury determined the negligence of the settling tortfeasor, then section 2(e) provided a *Palestine Contractors*-type proportionate reduction based on the settling tortfeasor's percentage of negligence. TEX. CIV.PRAC. & REM.CODE ANN. § 33.015 (Vernon 1986 and Vernon Supp.1990); *Muller*, 640 S.W.2d at 863.

A credit against the judgment, whether a dollar-for-dollar reduction under *Bradshaw v. Baylor University* or a *Palestine Contractors* proportional credit, only applies if the settling and non-settling parties are joint tortfeasors. Assuming that *Duncan* is inapplicable to the facts here, First Title and Alamo Title had to at least establish by proof that Jenkins and Dameron were joint tortfeasors before they would be entitled to a dollar credit. However, the record simply does not reflect the basis of the Garretts' suit against Jenkins and Dameron or the basis of their liability, if any.[2] Accordingly, the court did not err when it refused to credit the settlement against the judgment. Point nine is also overruled for this reason.

Point eleven was that the Garretts failed to demonstrate good cause for the allegedly late designation of their previously undisclosed accounting expert. An allegation was made under the "lack of good cause" point that the Garretts failed to disclose their expert "as soon as practical." *See* TEX.R.CIV.P. 166b(6)(b). First Title and Alamo Title point out on rehearing that the "as soon as practical" allegation was not addressed in the opinion.

Even though a party may disclose an expert more than thirty days prior to the beginning of trial, the court has the discretion to suppress the expert's testimony because the disclosure was not made as soon as practical. *Id.; Builder's Equipment Co. v. Onion*, 713 S.W.2d 786, 788 (Tex. App.—San Antonio 1986, no writ). That discretion can be abused. *Williams v. Crier*, 734 S.W.2d 190, 193 (Tex.App.—Dallas 1987, no writ). However, the record does not reflect that the court clearly abused its discretion when it refused to suppress the accounting expert's testimony on the ground that the disclosure was not made as

---

2. The settlement agreement, which was introduced as an exhibit, reflects that Jenkins and Dameron settled the suit with the Garretts based on the customary denial of liability.

soon as practical. Point eleven is also overruled for this reason. The motion for a rehearing is denied.